February 2016, Mr. Siders stated that he had been hospitalized two times in six months in 2015 for schizophrenia. She would have known that Mr. Siders was prescribed Klonopin, Trazedone, and Invega, all of which are medications prescribed for serious psychological disorders. Finally, she would have been aware of the fact that in February 2016, Mr. Siders reported to the WRJ, PrimeCare, and/or PSIMED staff he was very worried about not getting his medications and that he stated that he would go crazy and that he heard voices without them. Had Ms. Petitte actually reviewed Mr. Siders' medical chart, she would have reviewed the medical records from St. Mary's Hospital that were faxed on March 1, 2017, at 1:55 p.m. Those records reflect that Siders was hospitalized on two occasions in 2015 for paranoid schizophrenia and polysubstance dependence. She would have seen that, as in this instance, he heard voices that the CIA was out to get him. She would have known that he had had visual hallucinations for years. She would have known that during his November 27, 2015 stay at St. Mary's Hospital, it took 20 days of counseling and administering medications to stabilize him for him to be able to safely leave the hospital. She would have known that his diagnosis on release was chronic paranoid schizophrenia with acute relapse. Had Ms. Petitte actually reviewed Mr. Siders' medical chart, she would have realized this was another acute relapse of his chronic paranoid schizophrenia. It is Ms. Petitte's decision as to whether or not she sees inmates who have been referred to her by a psychologist, a corrections officer, or the nursing staff. No one else dictates who is seen by her, the priority of who gets to see her, or what treatment she provides. Ms. Petitte has a history and practice of regularly refusing to see inmates when they are referred to her. PrimeCare and PSIMED are aware of the fact that she has refused to see inmates in the past. In this case, as she has done in the past, she made the decision to not see Mr. Siders, despite the fact that he had a long history of serious

HER LAW OFFICE
FIFTH AVENUE
NGTON, WV 25701

04) 523-3217
(304) 523-3184

11

psychological issues and was obviously suffering from hallucinations and delusions. She stated that she reviewed his records when in fact she couldn't have possibly reviewed them and reached the conclusion that he did not previously have psychological issues. The only action that she took to render any care to Mr. Siders was prescribing a low dose of Klonopin for drug withdrawal and scheduling a follow-up with him in two weeks. Although she prescribed the Klonopin, it was not given to Mr. Siders prior to his death. She prescribed the Klonopin at 10:28 a.m. on March 2, 2017, and Mr. Siders was taken out of his cell unresponsive at approximately 4:00 p.m. on the same day. No one gave him the Klonopin as prescribed. Ms. Petitte stated that she discussed her actions or inactions herein with her boss, presumably Dr. Timothy Thistlewaite, and was told that her actions were appropriate and that he would have done the same as she.

24. Mr. Siders was placed in protective custody in cell A-8-4 from 19:34 hours on March 1, 2017, until his lifeless body was discovered at 15:57 hours on March 2, 2017.

25. WRJ Officer Jimmy Pine, hereinafter "Pine," was working in A-Pod while Mr. Siders was housed there. He was interviewed during the investigation of the facts surrounding Mr. Siders' death, and he stated that other inmates told him Mr. Siders was crazy and wasn't right and asked him to check on Mr. Siders. He stated that he spoke with Mr. Siders on a couple of occasions while he was in protective custody. During one of the conversations, Mr. Siders told Pine that he was drinking a lot of water to wash the demons out of himself. Pine felt that the amount of water that Mr. Siders was drinking was excessive. Mr. Siders also told Pine that there was someone in his cell with him when it was clear to Pine that he was alone. Pine stated that Mr. Siders was talking out of his head and had slurred speech the entire evening. Pine later characterized Siders' behavior as being strange and bizarre. Although Pine noted

HER LAW OFFICE
FIFTH AVENUE
NGTON WV 25701

04) 523-3217
(304) 523-3184

that the excessive water drinking continued throughout the entire evening, he did nothing other than to tell Mr. Siders it would make him sick.

26. Inmate Jacob Davis, hereinafter "Davis," was interviewed during the investigation of the facts surrounding Mr. Siders' death and stated that he told a corrections officer about Siders drinking excessive amounts of water, vomiting, and his bizarre actions; and the officer checked on Mr. Siders. He stated that he witnessed the officer ask Mr. Siders why he was drinking and vomiting and heard Siders telling the officer that he was trying to rid himself of demons. He witnessed the officer tell Mr. Siders he might want to quit drinking the water and lie down and get some rest. He said the officer was laughing as he walked away. It is the Plaintiff's belief, based upon the facts herein, that the officer who walked away laughing was Officer Pine. Despite having witnessed Mr. Siders' strange and bizarre condition, Pine did not cause him to be taken to medical, did not report Mr. Siders' behavior to a supervisor, and took no steps to insure Mr. Siders' safety and well-being.

27. Corrections Officer Ricky Gaberielse, hereinafter referred to as "Gaberielse," was working in the A-pod Tower while Mr. Siders was housed in A-Pod and was interviewed during the investigation of the facts surrounding Siders' death. He stated that he was not supposed to be in the A-Pod due to a PREA (Prison Rape Elimination Act) complaint against him. When Gaberielse started his shift on March 1, 2017, he was informed by Officer Keaton that there was a guy in A8 cell 4 (Siders' cell) that was acting real crazy, that had been beeping the tower intercom all day, and to ignore his behavior. When Gaberielse started his shift, Mr. Siders called on the intercom. Gaberielse stated it sounded like there were two inmates in the cell. Mr. Siders told Gaberielse that Marilyn Manson was in the cell with him. When a Rover (Officer Pine) was doing security checks, Gaberielse stated he turned on the

HER LAW OFFICE
FIFTH AVENUE
NGTON, WV 25701

(304) 523-3217
(304) 523-3184

13

intercom so he could hear the conversation. He heard the Rover question Mr. Siders about why he was drinking so much water. Gaberielse was told that Mr. Siders was withdrawing. Officer Pine relieved Gaberielse from Tower duty while Gaberielse took lunch. When Pine relieved Gaberielse from duty, he noticed that Gaberielse left the intercoms on in the A-Pod. According to Pine, the purpose of leaving intercoms on is to block inmates from calling the Tower. Pine stated that it is common practice to leave intercoms on to keep inmates from contacting the Tower, that he has seen it happen many times, and that doing so is a huge safety issue. Gaberielse admitted to sleeping while on duty in the Tower during the shift when Mr. Siders was in A-Pod. Turning the intercom off would allow him to not be bothered by inmate calls while he slept.

28. Several inmates who were housed in the A-Pod were also interviewed in the investigation of the facts surrounding Mr. Siders' death. Inmate Jacob Davis, previously referred to as "Davis," was housed in A-Pod with Mr. Siders and stated that Mr. Siders was talking to walls and saying he saw demons. He stated that after Mr. Siders was in the cell for 30-40 minutes, he was hitting the box (intercom) saying he was suicidal. Davis stated that Mr. Siders was continuously drinking water and vomiting all evening. He stated Mr. Siders was doing this to get rid of the demons. Inmate Eric Murphy stated that he and other inmates believed that Mr. Siders was on bath salts and was acting crazy. He stated that he and the other inmates talked Mr. Siders into calling the Tower and request to be placed on suicide watch. He stated that Mr. Siders hit the button (intercom) and told Officer Gaberielse that he needed to go on suicide watch and that he was going to kill himself. According to Murphy, Gaberielse did not send anyone to check on Mr. Siders. Murphy stated that Gaberielse has a history of refusing medical treatment for inmates, including him. He once called the Tower

:HER LAW OFFICE
i FIFTH AVENUE
INGTON, WV 25701

304) 523-3217
< (304) 523-3184

and told Gaberielse he was having chest pains only to be ignored. Inmate Jason White stated that on March 2 between 2 a.m. and 3 a.m., Mr. Siders called the Tower on the intercom and told Gaberielse that he needed to be on suicide watch, but Gaberielse never sent anyone to help him. Inmate Henry Duncan stated that upon speaking with Mr. Siders and as a result of Mr. Siders acting crazy, he convinced Siders to contact the Tower to request that he be placed on suicide watch. He stated that Mr. Siders hit the intercom and told Gaberielse that he was suicidal. He thought this was around 1:30 a.m. Inmate Daniel Plants stated that Mr. Siders told corrections officers at about 2 a.m. that he needed to go to medical or he was going to commit suicide. He further stated that the officers asked Mr. Siders why he was drinking hot water, to which he responded he was trying to wash the demons away. They then asked him why he was throwing up and Mr. Siders said the water was hot. They then told him if that was why he was throwing up, he shouldn't drink hot water. According to Plants, the officers told Mr. Siders he was fine and he should lie down and sleep it off. He stated that Gaberielse was in the Tower and must have thought Siders' behavior was a joke, as he was laughing about it. Gaberielse told Officer Spry, who relieved him on his shift that Charles Manson is now living in Section A8 (Siders' cell). Despite hearing Mr. Siders stating that Marilyn/Charles Manson was in the cell with him, despite stating that Mr. Siders was talking crazy all night, despite having knowledge that Mr. Siders was drinking excessive amounts of water all night to wash the demons out, and despite the fact that Mr. Siders and several inmates called Gaberielse to report that Mr. Siders was suicidal, Gaberielse did not refer Siders to medical, he did not he inform a supervisor about Siders' behavior, and he did not take any steps to insure Mr. Siders' safety and well-being. He turned off the intercoms, took a nap, and ignored Mr. Siders' and the other inmates' pleas for help.

:HER LAW OFFICE
; FIFTH AVENUE
NGTON, WV 25701

304) 523-3217
( (304) 523-3184

29. Security checks at WRJ in the protective custody section are required to be performed every hour. In order to properly perform a security check, the officer charged with the task must make sure the inmate is alive and breathing. There are conflicting statements regarding when the last security check was performed prior to Mr. Siders' death. The last security check logged per Officer Julie Spry, who was in charge of the A-Pod Tower, was at 11:40 a.m. and Mr. Siders' body was not found until 15:57 (3:57 p.m.). She stated other officers were in A-pod that day and could have done security checks but did not do so; and she did not direct them to. Many other security checks were not performed as required by WRJ policy during Mr. Siders' stay in protective custody in A-Pod.

30. The officers present in A-Pod at the time of Mr. Siders' death were Julie Spry, hereinafter referred to as "Spry," Stephen Kraus, hereinafter referred to as "Kraus," and Nicholas Canterbury, hereinafter referred to as "Canterbury." These officers were interviewed during the investigation regarding the facts surrounding Mr. Siders' death. Canterbury was an officer in training and Kraus was only on his second day being off training and his first day in A-Pod by himself. Per WRJ policy, security checks are to be performed every hour. Only three security checks were performed on the day of Mr. Siders' death. Kraus was a Rover that day. Rovers are supposed to retrieve food trays from inmate cells after each meal. Kraus stated it is important to collect trays because like a security check, it allows you to see an inmate and make sure he is o.k. At the time of the discovery of Mr. Siders' body, there were three trays in his cell. This meant that no one took his trays as required for a twenty-four (24) hour time period. When Kraus found Mr. Siders in his cell, he appeared blue. Kraus began performing CRP by compressing Mr. Siders' chest; however, he did not attempt to breath for him. During the same time, Spry, who was in charge of the

HER LAW OFFICE
FIFTH AVENUE
INGTON, WV 25701

304) 523-3217
(304) 523-3184

A-pod Tower, was notified of Mr. Siders' emergency. At that time, she was not working in the Tower. An officer in training was there while Spry was in the Pod cleaning up water that had flowed from what is believed to be Mr. Siders' cell to the Tower. When Mr. Siders was taken from his cell, water was everywhere and was an inch deep in his cell. Spry had to call medical twice before getting any response. This caused an additional lapse of time for Mr. Siders to receive proper medical treatment.

31. While performing CPR, several of those involved noticed water coming out of Mr. Siders' mouth and nose at each chest compression. Officer Peyton surmised Mr. Siders had drowned himself as there was about an inch of water in his cell.

32. Mr. Siders was taken to St. Mary's Hospital where he was pronounced dead.

33. An autopsy was performed by the West Virginia Medical Examiner's Office, and the cause Mr. Siders' death was excited delirium due to methamphetamine intoxication and schizophrenia.

## COUNT I

### DEPRIVATION OF CONSTITUTIONAL RIGHTS
### WEST VIRGINIA CONSTITUTION
(Against All Defendants)

34. Plaintiff re-alleges and incorporates all preceding Paragraphs of this Complaint.

35. WVDCR/WRJ, PrimeCare, PSIMED, Anita Petitte, Officer Pine, Officer Gaberielse, and John and Jane Doe or Does, Defendant or Defendants, through their agents, servants and employees, acted with deliberate indifference to the medical needs of Bradley Siders, II, in violation of the Constitution of the State of West Virginia, particularly Article III, §§5 and 10, entitling Plaintiff to bring the civil action under the laws of the State of West Virginia.

HER LAW OFFICE
FIFTH AVENUE
NGTON, WV 25701

304) 523-3217
((304) 523-3184

36. As a direct and proximate result of the deliberate indifference of the Defendants toward Mr. Siders' medical condition, he died, entitling the representative of his Estate to bring this civil action seeking damages on behalf of herself and all others entitled to relief pursuant to West Virginia Code §55-7-6, including damages for:

   a. sorrow, mental anguish, and solace, including, but not limited to, loss of society, companionship, comfort, guidance, kindly offices and advice;
   b. compensation for reasonably expected loss of income and household services;
   c. services, protection, care, and assistance;
   d. medical expenses;
   e. economic loss;
   f. reasonable funeral expenses; and
   g. such other and further relief as to the jury may seem fair and just.

37. As a further direct and proximate result of the deliberate indifference of the Defendants toward Mr. Siders' medical condition, he incurred pain and suffering prior to his death entitling Plaintiff to seek damages on behalf of Mr. Siders for pain and suffering in an amount to be determined by the jury, including attorney fees, expenses and costs.

### COUNT II

### VIOLATION OF THE WEST VIRGINIA MEDICAL PROFESSIONAL LIABILITY ACT
(Against PrimeCare, PSIMED, and their John and Jane Doe employees and Anita Petitte)

38. Plaintiff re-alleges and incorporates all preceding Paragraphs of this Complaint.

39. PrimeCare, PSIMED, and PrimeCare and PSIMED employees, including but not limited to Anita Petitte, failed to exercise the degree of care, skill, and learning required or expected of a reasonable, prudent health care provider acting in the same or similar circumstances in providing medical services to Mr. Siders.

40. The acts and omissions of the Defendants breached the duty of care owed by the Defendants to Mr. Siders in violation of West Virginia Code §55-7B-1 *et.seq.*, West Virginia Medical Professional Liability Act; namely, failing to provide Bradley Siders, II with access to an adequate mental health evaluation and failing to provide proper medical treatment.

41. As a direct and proximate result of the breach of duty of care of the Defendants toward Mr. Siders' medical condition, he died, entitling the representative of his Estate to bring this civil action seeking damages on behalf of herself and all others entitled to relief pursuant to West Virginia Code §55-7-6, including damages for:

   a. sorrow, mental anguish, and solace, including, but not limited to, loss of society, companionship, comfort, guidance, kindly offices and advice;
   b. compensation for reasonably expected loss of income and household services;
   c. services, protection, care, and assistance;
   d. medical expenses;
   e. economic loss;
   f. reasonable funeral expenses; and
   g. such other and further relief as to the jury may seem fair and just.

42. As a direct and proximate result of the breach of duty of care owed by the Defendants to Bradley Siders, II, he incurred pain and suffering prior to his death entitling Plaintiff to seek damages on behalf of Mr. Siders for pain and suffering in an amount to be determined by the jury, including attorney fees, expenses and costs.

## COUNT III

NEGLIGENCE
(Against the WVDCR/WRJ, Gaberielse, Pine, and WRJ's John and Jane Doe employees)

43. Plaintiff re-alleges and incorporates all preceding Paragraphs of this Complaint.

CHER LAW OFFICE
5 FIFTH AVENUE
INGTON, WV 25701

304) 523-3217
X (304) 523-3184

44. WVDCR/WRJ and WVDCR/WRJ employees including, but not limited to Officer Gaberielse and Officer Pine, had a duty to provide Mr. Siders with the following: access to proper mental health evaluation, a proper housing classification, and proper medical treatment. A reasonable person would have clearly recognized this duty.

45. They breached this duty by not providing Mr. Siders access to a proper mental health evaluation, to a proper housing classification, and to proper medical treatment. This breach of duty and neglect was done with a reckless disregard for Mr. Siders' welfare and rights.

46. As a direct and proximate result of the breach of duty of care of the Defendants toward Mr. Siders' medical condition, he died, entitling the representative of his Estate to bring this civil action seeking damages for:

   a. sorrow, mental anguish, and solace, including, but not limited to, loss of society, companionship, comfort, guidance, kindly offices and advice;
   b. compensation for reasonably expected loss of income and household services;
   c. services, protection, care, and assistance;
   d. medical expenses;
   e. economic loss;
   f. reasonable funeral expenses; and
   g. such other and further relief as to the jury may seem fair and just.

47. As a direct and proximate result of the breach of duty of care owed by the Defendants to Mr. Siders, he incurred pain and suffering prior to his death entitling Plaintiff to seek damages on behalf of Siders for pain and suffering in an amount to be determined by the jury, including attorney fees, expenses and costs.

## COUNT IV

### NEGLIGENT HIRING, TRAINING, SUPERVISION AND RETENTION
(Against WVDCR/WRJ, PrimeCare, and PSIMED)

48. Plaintiff re-alleges and incorporates all preceding Paragraphs of this Complaint.

CHER LAW OFFICE
5 FIFTH AVENUE
INGTON, WV 25701

304) 523-3217
X (304) 523-3184

20

49. Defendants WVDCR/WRJ, PrimeCare, and PSIMED had a duty to hire employees who possessed skills and training to adequately perform the job duties for which they were hired.

50. Defendants WVDCR/WRJ, PrimeCare, and PSIMED had a duty to properly train, supervise and retain their employees.

51. Employees of Defendants WVDCR/WRJ, PrimeCare, and PSIMED were acting in the scope of their employment; and, as such, said Defendants are vicariously liable for the negligent employment, training, supervision and retention of their employees herein under the doctrine of *respondent superior*. All Defendants herein violated clearly established rights and laws with respect to the training, supervision, discipline, employment and retention of their employees, which was a proximate cause of Mr. Siders' injuries and damages.

52. As a direct and proximate result of the Defendants' negligent hiring, training, supervision, and retaining their employees, Mr. Siders died, entitling the representative of his Estate to bring this civil action seeking damages for:

   a. sorrow, mental anguish, and solace, including, but not limited to, loss of society, companionship, comfort, guidance, kindly offices and advice;
   b. compensation for reasonably expected loss of income and household services;
   c. services, protection, care, and assistance;
   d. medical expenses;
   e. economic loss;
   f. reasonable funeral expenses; and
   g. such other and further relief as to the jury may seem fair and just.

53. As a direct and proximate result of the Defendants' negligent hiring, training, supervision, and retaining their employees, Mr. Siders incurred pain and suffering prior to his death, entitling Plaintiff to seek damages on behalf of Siders for pain and suffering in an amount to be determined by the jury, including attorney fees, expenses and costs.

CHER LAW OFFICE
3 FIFTH AVENUE
INGTON, WV 25701

304) 523-3217
X (304) 523-3184

21

## COUNT V

VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT
(Against WVDCR/WRJ, PrimeCare, PSIMED, Officer Gaberielse, Officer Pine, Anita Pettite and WRJ's John and Jane Doe employees)

54. Plaintiff re-alleges and incorporates all preceding Paragraphs of this Complaint.

55. The West Virginia Human Rights Act provides for equal opportunity and protects against unlawful discriminatory practices.

56. Mr. Siders was a person with a disability under the Act, as he suffered from, among other things, mental illness, Schizophrenia and depression and was at a high risk of suicide.

57. Defendants had notice of Mr. Siders' disability and had the means to reasonably accommodate his disability, but failed to make that reasonable accommodation.

58. Instead of accommodating Mr. Siders' needs, the Defendants denied him the services and programs available to others, including, but not limited to, access to appropriate medication and access to appropriate medical care and treatment that would have protected him and would have reduced the risk of his death. The failure to accommodate Mr. Siders' disability was intentional and/or deliberately indifferent to his rights under the Act and was a proximate cause of his death.

59. Mr. Siders' death was a direct and proximate result of the Defendants' failure to reasonably accommodate his disability. His death entitled the representative of his Estate to bring this civil action seeking damages for:

    a. sorrow, mental anguish, and solace, including, but not limited to, loss of society, companionship, comfort, guidance, kindly offices and advice;
    b. compensation for reasonably expected loss of income and household services;
    c. services, protection, care, and assistance;
    d. medical expenses;
    e. economic loss;
    f. reasonable funeral expenses; and
    g. such other and further relief as to the jury may seem fair and just.

CHER LAW OFFICE
5 FIFTH AVENUE
INGTON, WV 25701

304) 523-3217
X (304) 523-3184

60. As a direct and proximate result of the Defendants' failure to reasonably accommodate Mr. Siders' disability, Mr. Siders incurred pain and suffering prior to his death, entitling Plaintiff to seek damages on his behalf for pain and suffering in an amount to be determined by the jury, including attorney fees, expenses and costs.

61. Plaintiff also seeks an award of punitive damages under the Act for Defendants' malicious, wanton, and oppressive disregard of Mr. Siders' rights.

**PLAINTIFF DEMANDS A JURY TRIAL**

KATHLEEN JEFFERS, individually and as
Administratrix of the ESTATE of
BRADLEY SIDERS, II, deceased
By Counsel

_____
Charles M. Hatcher, III, WVSB No. 7600
HATCHER LAW OFFICE
636 Fifth Avenue
Huntington, West Virginia 25701
(304) 523-3217 telephone (304) 523-3184 facsimile

*Counsel for Plaintiff*