# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

KATHLEEN JEFFERS, individually
and as Administratrix of the Estate of
Bradley Siders, II, deceased,

                    Plaintiff,

v.                                                 CIVIL ACTION NO. 3:19-0462

WEST VIRGINIA DIVISION OF CORRECTIONS
AND REHABILITATION, formerly West Virginia
Regional Jail and Correctional Facility Authority;
OFFICER RICKY GABERIELSE, individually and as an
agent of West Virginia Division of Corrections and Rehabilitation;
OFFICER JIMMY PINE, individually and as an agent
of West Virginia Division of Corrections and Rehabilitation;
PRIMECARE MEDICAL OF WEST VIRGINIA, INC.;
PSIMED CORRECTIONS, LLC;
ANITA PETITTE, individually and as an employee of
PrimeCare Medical of West Virginia, Inc. and/or PSIMed
Corrections, LLC; and
JOHN and JANE DOE or DOES,

                    Defendants.

## MEMORANDUM OPINION AND ORDER

Presently pending before the Court are effectively three motions to dismiss, all filed by different sets of defendants. The first motion is filed by Defendants Ricky Gaberielse and Jimmy Pine, and seeks dismissal of the Third Amended Complaint in its entirety pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *Gaberielse/Pine Mot. to Dismiss*, ECF No. 45. The second motion is filed by Defendant PrimeCare Medical of West Virginia ("PrimeCare"), and seeks dismissal of Count Nine pursuant to Federal Rule of Civil Procedure 12(b)(6). *PrimeCare Mot. to Dismiss*, ECF No. 49. Finally, the third motion is filed by Defendants

Anita Petitte and PSIMed Corrections, LLC ("PSIMed"), and seeks to join PrimeCare's motion to dismiss Count Nine. *Petitte/PSIMed Mot.*, ECF No. 55. The Court **GRANTS** the third motion, and construes PrimeCare's Motion to Dismiss as filed on behalf of PrimeCare, PSIMed, and Anita Petitte for the purposes of this opinion. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** both remaining motions.

## I. BACKGROUND

This action arises out of the tragic death of Bradley Siders, an inmate at the Western Regional Jail and Correctional Facility in Barboursville, West Virginia.[1] *See Third Am. Compl.*, ECF No. 44, at ¶¶ 16, 33. Siders, who had only been committed to the facility the previous afternoon, was found unresponsive in his cell at 3:57 p.m. on March 2, 2017. *Id*. With Siders lying in a pool of water on the floor, officers attempted chest compressions before he was pronounced dead at St. Mary's Hospital. *Id.* at ¶ 48. An autopsy performed by the West Virginia Medical Examiner's Office determined that Siders' cause of death was "excited delirium due to methamphetamine intoxication and schizophrenia." *Id.* at ¶ 50.

It is the second half of this conclusion that plays a central role in the instant case. Prior to his incarceration, "Siders had been diagnosed with serious and severe psychological issues," including schizophrenia. *Id.* at ¶ 17. He had been prescribed medication for the treatment of his schizophrenia and other mental health issues, though it is unclear if Siders was still taking them at the time of his arrest. *Id.* It is likewise unclear what exact criminal conduct led to Siders' incarceration in the first place—the Third Amended Complaint refers only to a "misdemeanor"—

---

[1] The facts of this case are drawn directly from the Third Amended Complaint, and are taken as true at this early stage of litigation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

but in any event, it appears he entered the Western Regional Jail at approximately 12:50 p.m. on March 1, 2017. *Id.* at ¶ 16.

Upon entering the jail, Siders was sent to Corporal Michael York for booking. *Id.* at ¶ 19. Siders' arresting officer informed York that he had been screaming "Black Hawk down" at the sky and talking about the Central Intelligence Agency at the time of his arrest. *Id.* Based on these statements, York determined that Siders should be placed in protective custody rather than the jail's general population. *Id.* He also requested that Siders be permitted to undergo an examination by someone in the jail's mental health unit. Pursuant to this request, Gail Thompson—a psychologist employed by Defendant PrimeCare or Defendant PSIMed[2]—conducted an initial mental health screening in the jail's booking area. *Id.* at ¶ 21. He mentioned recently using drugs, and that he had "acted distracted" and "was moving his lips a lot." *Id.* Susie Christian—a nurse employed by PrimeCare—also examined Siders. *Id.* at ¶ 20. Siders informed Christian of previous suicide attempts, past incarcerations, a lengthy history of psychological problems, and various addictions to drugs including heroin, benzodiazapams, and bath salts. *Id*. Notwithstanding this background, both Thompson and Christian "cleared him for housing in the general population" unit, or "C-Pod." *Id.* at ¶¶ 20–21, 25.

Upon his arrival in C-Pod, Siders told corrections officers that he was "General Siders from the Star Gate Galactic and that he was there on the Director's orders to make sure everything was right in the jail." *Id.* at ¶ 26. Understandably concerned by these statements, the officers contacted the medical unit for another examination. *Id.* Two nurses employed by PrimeCare—Craig Conner and Kristen Turner—examined Siders. *Id.* They discovered needle marks on his arms, and noted

---

[2] Both defendants "provide[] medical services to those incarcerated in West Virginia jails through a contract with" the West Virginia Department of Corrections and Rehabilitation. *Third Am. Compl.*, at ¶¶ 10–11.

that he used "Geek x2" the previous day. *Id.* at ¶ 27. Turner interviewed Siders and determined that he was not suicidal, though he did recall further disturbing statements about the "Star Gate Command Program." *Id.* at ¶ 27–28. As he had been employed by PrimeCare for just two months, Conner deferred to Turner's judgment on the question of Siders' mental stability. *Id.* at ¶ 27.

Though the Third Amended Complaint is silent as to why, Siders was taken to protective custody—or "A-Pod"—after his visit with Conner and Turner instead of general population. *Id.* at ¶ 28. During his stay in protective custody, Siders spoke with Defendant Corrections Officer Jimmy Pine "on a couple of occasions." *Id.* at ¶ 34. Siders told Pine that "he was drinking a lot of water to wash the demons out of himself"—an amount that Pine thought was "excessive." *Id.* Siders also told Pine that "there was someone in his cell with him, when it was clear to Pine that he was alone." *Id.* at ¶ 34. Pine told Siders that drinking the water "would make him sick," but took no other action. Another inmate recalls an officer—possibly Pine—"laughing as he walked away" from Siders' cell. *Id.* at ¶ 35.

Defendant Corrections Officer Ricky Gaberielse was also working in A-Pod during Siders' incarceration. *Id.* at ¶ 36. He began his shift in the control tower on the evening of March 1, when he was informed by a departing officer that "there was a guy in [Siders' cell] that was acting real crazy." *Id.* at ¶ 36. The officer advised Gaberielse to ignore the behavior. *Id.* He did so, as Siders' increasingly unbalanced ranting continued through the night; Gaberielse even recalls falling asleep at one point. *Id.* Other inmates remember calling the tower to request that Siders be placed on suicide watch. *Id.* at ¶ 39–42. At the end of his shift, he "did not refer Siders to medical, he did not . . . inform a supervisor about Siders' behavior, and he did not take any steps to [e]nsure Mr. Siders' safety and well-being." *Id.* Instead, "Officer Pine relieved Gaberielse from Tower duty while

Gaberielse took lunch." *Id.* at ¶ 37. Pine recalled that Gaberielse had "left the intercoms on," the purpose of which "is to block inmates from calling the Tower." *Id.*

At some point on March 2, Anita Petitte—a nurse practitioner operating under the supervision of a licensed psychiatrist—arrived at the Western Regional Jail to review Siders' (and presumably other patients') charts.[3] *Id.* at ¶ 29. Petitte—who had seen Siders two years prior during a previous incarceration—remembered reviewing Siders' chart for fifteen minutes at the jail. *Id.* at ¶ 30. Despite the extensive and worrisome history outlined on Siders' chart, Petitte's only actions were to prescribe "a low dose of Klonopin for drug withdrawal"[4] and schedule a follow-up appointment in two weeks. *Id.* at ¶ 31. She elected not to meet with Siders during her visit. *Id.* at ¶ 30.

The last security check of A-Pod prior to Siders' death was logged at 11:40 a.m. on March 2 by Officer Julie Spry. At 3:57 p.m., Officer Stephen Kraus found Siders looking "blue" and lying in an inch of water in his cell. *Id.* at ¶ 47. He began chest compressions, while another officer called for medical assistance twice. *Id.* During the compressions, several onlookers noted "water coming out of Mr. Siders' mouth and nose." *Id.* at ¶ 48. Siders was transported to St. Mary's Hospital, where he was pronounced dead. *Id.* at ¶ 49. As has already been noted, an autopsy performed by the West Virginia Medical Examiner's Office determined that Siders' cause of death was "excited delirium due to methamphetamine intoxication and schizophrenia." *Id.* at ¶ 50.

On August 24, 2018, Plaintiff Kathleen Jeffers, individually and as administratrix of Siders' estate, instituted this action in the Circuit Court of Cabell County. *Ex. 2*, ECF 1-3. Over

---

[3] Petitte is employed by PSIMed. *Compare PrimeCare Answer*, ECF No. 48, at 6, *with PSIMed/Petitte Answer*, ECF No. 54, at 7.

[4] The Klonopin was not delivered to Siders before his death later that afternoon. *Third Am. Compl.* at ¶ 31.

the course of the following months, Plaintiff amended her complaint twice and took part in several motions hearings. *Id.* Plaintiff named six defendants in her Complaint: the West Virginia Department of Corrections and Rehabilitation ("WVDCR"), PrimeCare, Gaberielse, Pine, PSIMed, and Peitte. She also "named" several John and Jane Doe defendants, allegedly employees of PrimeCare, the WVDCR, and PSIMed. *Id.* at 1. At core, Plaintiff's arguments stem from Defendants' alleged failure to provide Siders with necessary medical care and attention in the hours leading up to his death.

Invoking this Court's federal question jurisdiction, WVDCR filed a Notice of Removal on June 17, 2019. *See Notice of Removal*, ECF No. 1, at 4. After nearly five months of litigation regarding the Second Amended Complaint, Plaintiff filed a Third Amended Complaint that mooted a set of pending motions to dismiss. *See Order*, ECF No. 43, at 3. On November 11, 2019, Gaberielse and Pine filed the instant Motion to Dismiss. *Gaberielse/Pine Mot. to Dismiss*, at 1. PrimeCare followed with its own motion on November 14, 2019. *PrimeCare Mot. to Dismiss*, at 1. Eleven days later, Anita Petitte and PSIMed followed with their motion to join PrimeCare in its Motion to Dismiss. *Petitte/PSIMed Mot.*, at 1. The issues presented in each motion have since been fully briefed, and are ripe for the Court's review.

## II. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Accordingly, a motion brought under Rule 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). While pleadings do not require detailed factual allegations, they must contain more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Aschcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Put differently, "naked assertions devoid of further

factual enhancements" are insufficient to survive a Rule 12(b)(6) challenge. *Id.* Instead, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* "Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When considering a motion to dismiss under Rule 12(b)(6), "the issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims" he or she makes. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). It therefore follows that a motion to dismiss testing the sufficiency of a complaint "generally cannot reach the merits of an affirmative defense." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Nevertheless, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Id.* "This principle only applies . . . if all facts necessary to the affirmative defense clearly appear on the face of the complaint." *Id.* (citing *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (internal quotations and punctuation omitted).

As a final matter, Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to challenge a court's subject matter jurisdiction. Where a court determines it lacks subject matter jurisdiction, it "must dismiss the action." Fed. R. Civ. P. 12(h)(3). "In contrast to its treatment of disputed issues of fact when considering a Rule 12(b)(6) motion, a court asked to dismiss for lack of jurisdiction may resolve factual disputes to determine the proper disposition of the motion." *Thigpen v. United States*, 800 F.2d 393, 396 (4th Cir. 1986). "The Fourth Circuit has not resolved whether a motion to dismiss based on the Eleventh Amendment is properly considered pursuant to Rule 12(b)(1) or 12(b)(6)," but the recent trend appears to treat Eleventh Amendment immunity

motions under Rule 12(b)(1)." *Chafin v. W. Reg'l Jail*, No. 3:13-cv-01706, 2013 WL 3716673, at *3 (S.D.W. Va. July 12, 2013) (internal quotation marks and citations omitted).

With this framework in mind, and guided by the proposition that "federal courts must take cognizance of the valid constitutional claims of prison inmates," *Turner v. Safley*, 482 U.S. 78, 84 (1987), the Court will consider each motion.

### III. DISCUSSION

Before turning to an analysis of the three counts implicated by the instant motions, the Court notes that Plaintiff brings this action against Gaberielse and Pine "individually and as . . . agent[s] of [the] West Virginia Division of Corrections and Rehabilitation." *Third Am. Compl.*, at 1. Gaberielse and Pine argue that Plaintiff's official-capacity claims based on their role as "agent[s] of" the WVDCR must be dismissed. *Mem. in Support of Gaberielse/Pine Mot. to Dismiss*, ECF No. 46, at 5. The Court's analysis on this point is straightforward: a defendant who is employed by an arm of the state and is sued in his official capacity "is also immune from suit in federal court under the Eleventh Amendment." *Edwards v. West Virginia*, No. 2:00-cv-0775, 2002 WL 34364404, at *5 (S.D.W. Va. Mar. 29, 2002). As correctional officers, Gaberielse and Pine are employed by an arm of the state and are therefore immune from suit in federal court in their official capacities. It follows that Plaintiff's claims against Gaberielse and Pine in their official capacities "as agent[s] of" the WVDCR must be dismissed.

What remains for the Court's consideration are three counts raised against Gaberielse and Pine in their individual capacities, one of which is also raised against PrimeCare, PSIMed, and Petitte. Count Two is a negligence claim, and is raised against Defendants Pine, Gaberielse, the WVDCR, and the WVDCR's John and Jane Doe employees. *Third Am. Compl.*, at ¶ 66. Count Six is a civil rights claim raised against Defendants Gaberielse, Pine, and the WVDCR's John and

Jane Doe employees, and is based on their alleged failure to provide medical care to Siders. *Id.* at ¶ 116. Finally, Count Nine is a claim for intentional infliction of emotional distress that is raised against all defendants. *Id.* at ¶ 147.

### A. Count Two: Negligence

Plaintiff's first claim against Gaberielse and Pine is raised in Count Two of the Third Amended Complaint. Count Two is a state law negligence claim alleging that Gaberielse and Pine breached their duty to provide Siders with a "proper mental health evaluation, to a proper housing classification, and to proper medical treatment." *Third Am. Compl.*, at ¶ 66. Gaberielse and Pine argue that Plaintiff has failed to sufficiently plead her negligence claim, and that they are shielded by qualified immunity in the alternative. The Court agrees with the latter argument, and so it need not consider the former.

It is axiomatic that a claim for negligence is a question of state tort law. *See Wheeling Park Comm'n v. Dattoli*, 787 S.E.2d 546, 551 (W. Va. 2016). Yet it is this feature of Plaintiff's claim that means West Virginia qualified immunity standards govern the Court's analysis. *Bosley v. Lemmon*, 656 F. Supp. 2d 582, 590 (S.D.W. Va. Aug. 31, 2009). Of course, these state standards broadly mirror their federal counterparts. *Kowalski v. Berkeley Cnty. Pub. Schs.*, No. 3:07-CV-147, 2009 WL 10675108, at *19 (N.D.W. Va. Dec. 22, 2009). Under state law, "[a] public executive official who is acting within the scope of his authority . . . is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established law of which a reasonable official would have known." *W. Va. Reg'l Jail and Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 755, Syl. Pt. 5 (W. Va. 2014) (quoting *State v. Chase Secs., Inc.*, 424 S.E.2d 591, Syl. (W. Va. 1992)). State law also does not provide immunity for acts that are "fraudulent, malicious, or otherwise oppressive." *Id.*

In considering the instant case, the Court finds guidance in the principle that allegations of simple negligence are not enough to overcome immunity. *A.B.*, 766 S.E.2d at 775 n. 32; *see also Clark v. Dunn*, 465 S.E.2d 374, 375, Syl. Pt. 6 (W. Va. 1995) ("[T]he doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act . . . and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer."). It follows that a "public officer is entitled to qualified immunity for discretionary acts, even if committed negligently." *Matson v. Wagner*, 781 S.E.2d 936, 948 (W. Va. 2015). Here, there can be no dispute that Gaberielse and Pine's alleged acts and omissions were discretionary. *See A.B.*, 766 S.E.2d at 768 (reasoning that the actions of correctional officers, "like most law enforcement officers, are *broadly* characterized as discretionary, requiring the use of . . . discretionary judgments and decisions"). With this immunity paradigm in mind, it is plain that Pine or Gaberielse cannot be held liable under a theory of simple negligence. At least with respect to Count Two, then, the guards' motion must be granted.

**B. Count Six: Civil Rights**

Gaberielse and Pine also move for dismissal of Count Six, which is a civil rights claim grounded in the Fourteenth Amendment of the United States Constitution. Plaintiff brings her claim under 42 U.S.C. § 1983, and argues that Gaberielse and Pine acted with deliberate indifference to Siders' medical needs. *See Third Am. Compl.*, at ¶ 123. Defendants contend that Plaintiff has failed to plead a sufficient § 1983 claim, and in the alternative that they are once again shielded by qualified immunity. Plaintiff naturally disagrees, and argues that Defendants' actions meet the deliberate indifference threshold and that qualified immunity does not apply.

At the outset, the Court recognizes that "the Eighth Amendment's proscription of cruel and unusual punishments is violated by deliberate indifference to serious medical needs of prisoners." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 243–44 (1983). As Siders was a pretrial detainee and not a prisoner, the Eighth Amendment has no direct application to his case; instead, he is protected by the Due Process Clause of the Fourteenth Amendment. *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 250 (4th Cir. 2005). Importantly, the standard for deliberate indifference to serious medical needs under the Fourteenth Amendment is at least as great as under the Eighth Amendment. *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (holding that a "pretrial detainee makes out a due process violation if he shows 'deliberate indifference to serious medical needs'").

Section 1983 provides a private cause of action for the deprivation of rights, under color of state law, secured by the Constitution and laws of the United States. *Hafer v. Melo*, 502 U.S. 21, 27 (1991). To state a claim for deliberate indifference to serious medical needs under § 1983, "a plaintiff must demonstrate (1) a deprivation of the plaintiff's rights by the defendant that is, objectively, sufficiently serious and (2) that the defendant's state of mind was one of deliberate indifference to inmate health or safety." *Carroll v. W. Va. Reg'l Jail & Corr. Facility Auth.*, No. 3:14-1702, 2015 WL 1395886, at *6 (S.D.W. Va. Mar. 25, 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (internal quotations omitted). With regard to the second prong, a plaintiff must demonstrate that a defendant "actually knew of and disregarded a substantial risk of serious injury to the detainee." *Young v. City of Mount Rainer*, 238 F.3d 567, 575–76 (4th Cir. 2001). It is not enough that an officer *should* have recognized a risk; instead, he must actually have perceived it. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). Moreover, an officer must have been "subjectively aware that his actions were inappropriate in light of the risk to inmate safety." *Carroll*, 2015 WL 1395886, at *6 (citing *Parrish*, 372 F.3d at 303).

Here, the Court has little trouble concluding that the deprivation of Siders' right to medical care was "sufficiently serious" to rise to the level of a constitutional violation. While the Fourteenth Amendment does not "mandate comfortable prisons," it does mandate "the minimal civilized measure of life's necessities." *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991). To state the obvious, life—as well as lifesaving medical care—are among life's necessities. It follows that the bulk of the parties' dispute focuses on the second prong of the deliberate indifference analysis. Defendants contend that the "facts of Plaintiff's Complaint do not support that either Pine or Gaberielse was aware of a serious risk to the Decedent's safety and knowingly disregarded that risk." *Mem. in Support of Gaberielse/Pine Mot. to Dismiss*, at 14. The Court would find this argument more persuasive if it did not immediately follow an exhaustive recounting of the many ways in which both Defendants were aware of serious risks to Siders' safety. Gaberielse and Pine themselves point out that "Plaintiff alleges . . . C.O. Pine was aware that [Siders] was drinking large amounts of water and was speaking of hallucinations which included demons and [an]other person being present in his cell," and that Siders "contacted Gaberielse and informed him that Marilyn Manson was in his cell." *Id.* at 13. They further reference Plaintiff's allegation that Siders "informed the Tower that he was suicidal,"[5] though they advance the bewildering argument that this assertion does not constitute an allegation that either guard possessed actual knowledge that he was suicidal. *Id.* at 10. Plaintiff has presented other allegations that Defendants understandably do not raise in their motion as well, including that Gaberielse "turned off the intercoms, took a nap, and ignored Mr. Siders' and the other inmates' pleas for help." *Third Am. Compl.*, at ¶ 36.

---

[5] Specifically, the Third Amended Complaint alleges that "Siders and several inmates called Gaberielse to report that Mr. Siders was suicidal." *Third Am. Compl.*, at ¶ 36.

The Court reiterates that, when considering a motion to dismiss pursuant to Rule 12(b)(6), it must accept "all well-pleaded allegations in the plaintiff's complaint as true" and draw "all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards*, 178 F.3d at 244. Taking all these allegations as true, it is evident that a factfinder could conclude Gaberielse and Pine were aware of a substantial risk of serious injury to Siders. *See Parrish ex rel. Lee*, 372 F.3d at 303 (reasoning that "a factfinder may conclude [an officer] knew of a substantial risk from the very fact that the risk was obvious"). Given the allegations here—that Siders informed Gaberielse he was suicidal, and that Pine had observed him consuming enough water to cause him to vomit—the risks are obvious enough.

It is equally clear that a factfinder could conclude the defendants were subjectively aware that their actions were inappropriate in light of the risk they posed to Siders' safety. *See id.* ("Similarly, a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances."). Plaintiff alleges that Gaberielse and Pine ignored Siders' ranting, drinking, and pleas for help by turning on the intercom to avoid communicating with him and laughing at his irrational behavior. *Third Am. Compl.*, at ¶¶ 34–36. While the Court acknowledges that deliberate indifference is a high standard requiring "a showing that the defendants . . . actually knew of *and* ignored a detainee's serious need for medical care," *Young*, 238 F.3d at 574 (emphasis added), it is nevertheless guided by the proposition that an officer's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs," *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990). Plaintiff's allegations meet this burden.

Once again, however, the Court must consider whether qualified immunity bars Plaintiff's claim. Defendants contend "[o]nly conduct that shocks the conscious [sic] is an actionable violation of the Fourteenth Amendment," *Mem. in Support of Gaberielse/Pine Mot. to Dismiss*, at 12 (citing *Parrish ex rel. Lee*, 372 F.3d at 302), and argue that "a reasonable officer would not know that failing to refer an inmate to medical who was detoxing from drugs and had been treated by medical multiple times within the previous 24 hours offended any statutory law or right," *id.* at 14.

As Plaintiff's claim is asserted under § 1983, federal qualified immunity standards govern the Court's review. *See Bosley*, 656 F. Supp. at 590. Broadly speaking, "[q]ualified immunity shields government officials from civil damages liability unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 663 (2012). Both prongs of this test ask questions of "objective legal reasonableness, without regard to whether the government official involved acted with subjective good faith." *Bosley*, 656 F. Supp. 2d at 590.

The Court first seeks to "identify the specific right that the plaintiff asserts was infringed by the challenged conduct, recognizing that the right must be defined at the appropriate level of particularity." *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997). In many cases, this analysis is fraught with complexity. *See Reichle*, 566 U.S. at 663. Not so today. The Eighth Amendment requires prison officials to "ensure that inmates receive adequate . . . medical care," *Farmer*, 511 U.S. at 832,[6] and this is exactly the deprivation that Plaintiff points to as a basis for her constitutional claim. It follows that little discussion is necessary with respect to the first prong of

---

[6] While this case involves a pretrial detainee and not a convicted prisoner, the Fourteenth Amendment provides at least the same protections against deliberate indifference to serious medical needs as does the Eighth Amendment. *Brown v. Harris*, 240 F.3d 383, 387 (4th Cir. 2001).

the qualified immunity test. If "adequate medical care" is to mean anything, it must certainly include responding in a timely manner to hallucinations and suicidal ideation. As such, Plaintiff has alleged the violation of a constitutional right.

The second prong of the qualified immunity analysis is even more straightforward, insofar as "[a] prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976 and, thus, was clearly established at the time of the events in question." *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016). Violation of this clearly established right is not shielded by qualified immunity, and Plaintiff has succeeded in alleging such a violation here. As such, the guards' motion must be denied with respect to Count Six.

### C. Count Nine: Intentional Infliction of Emotional Distress

Each of the pending motions requests dismissal of Count Nine, which raises a claim for intentional infliction of emotional distress ("IIED"). Plaintiff raises this claim against all Defendants named in her suit, and argues that that their actions "constitute outrageous conduct not to be tolerated by a reasonable person in a civilized society." *Third. Am. Compl.*, at ¶ 148. The defendants reject this allegation, arguing that their respective conduct does not meet the "notoriously high burden" for outrageous conduct under West Virginia law. *Bourne v. Mapother & Mapother, P.S.C.*, 998 F. Supp. 2d 495, 507 (S.D.W. Va. 2014) (internal quotations omitted).

To sustain an IIED claim in West Virginia, a plaintiff must establish four elements:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from its conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Labs, Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998) (emphasis added). "[I]n evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress." *Id.* at 428. To meet this burden, a plaintiff must allege conduct that is "so outrageous in character, and so extreme in degree, as to go *beyond all possible bounds of decency*, and to be regarded as *atrocious* and *utterly intolerable in a civilized society*." *Keyes v. Keyes*, 392 S.E.2d 693, 696 (W. Va. 1990) (emphasis in original). A court's role is therefore to undertake a highly fact-specific inquiry into particular allegations made against particular defendants and determine whether a plaintiff has alleged conduct that may reasonably be regarded as meeting this high threshold.

### 1. PrimeCare, PSIMed, and Petitte

The Court begins with a review of allegations against PrimeCare, PSIMed, and Petitte. The Third Amended Complaint effectively involves contact with Petitte and four other employees:[7] Susie Christian, Gail Thompson, Craig Conner, and Kristen Turner. While Petitte is the only employee named in this suit, employers are liable for the acts of their employees taken within the scope of their employment. *Dunn v. Rockwell*, 689 S.E.2d 255, 274 (W. Va. 2009). PSIMed and PrimeCare are therefore subject to liability based on the actions of each employee, whether or not he or she is a named party to this case.

---

[7] The Third Amended Complaint is often ambiguous about which company employs which individual, and does not clarify at any point whether Petitte and Thompson are employed by PrimeCare or PSIMed. *See, e.g., Third Am. Compl.*, at ¶¶ 13, 21. Nevertheless, PrimeCare and PSIMed's respective answers to the Third Amended Complaint make clear that Anita Petitte is employed by PSIMed. *Compare PrimeCare Answer*, ECF No. 48, at 6, *with PSIMed/Petitte Answer*, ECF No. 54, at 7. It is also clear that Christian, Conner, and Turner were employed by PrimeCare during the dates in question. *Third Am. Compl.*, at ¶¶ 20, 26.

All five employees consulted with Siders at a different point over the course of his incarceration, and so the Court will consider each interaction separately. Christian, a nurse, allegedly conducted Siders' health evaluation at intake. *Third Am. Compl.*, at ¶ 20. Thompson, a psychologist, conducted his mental health evaluation immediately after. *Id.* at ¶ 21–24. The thrust of the Third Amended Complaint's allegations against Christian and Thompson is that that they both missed various warning signs that should have placed them on notice that Siders was not fit to be housed in general population. *Id.* at ¶ 20–24. This may well be the case, as the Third Amended Complaint does not paint a picture of especially thorough evaluations by either employee. Yet the Court's role in this inquiry is not to determine the propriety of these cursory consultations, but rather whether the conduct at issue is "utterly intolerable in a civil society." *Keyes*, 392 S.E.2d at 696. Christian and Thompson's conduct falls well short of this burden.

Later on March 1, Plaintiff alleges that Siders treated with Nurses Conner and Turner because of his "odd behavior." *Third Am. Compl.*, at ¶ 27. The Third Amended Complaint alleges that the nurses—and principally Turner—determined that Siders was not suicidal after "only about two minutes of interviewing" him. *Id.* Once again, this may well be true. Yet the brevity of the nurses' interaction with Siders cannot reasonably give rise to a finding that their conduct was sufficiently outrageous to constitute the intentional or reckless infliction of emotional distress. In fact, brief though their interview with Siders apparently was, he was immediately moved from general population to protective custody and was scheduled for a psychiatric appointment the next day. *Third Am. Compl.*, at ¶¶ 28–29. Conner and Turner's conduct therefore also falls short of the first *Travis* element.

The final relevant course of conduct involves Anita Petitte, a nurse practitioner asked to review Siders' psychological condition. *Id.* at ¶ 29–32. Petitte chose not to see Siders, though she

remembers that she reviewed his chart for approximately fifteen minutes before prescribing him a dose of Klonopin. *Id.* at ¶ 30. Plaintiff disputes this recollection, arguing that Petitte either "intentionally misled the investigator about her action of reviewing Mr. Siders' chart, or her review was deliberately indifferent to his needs because his medical file at the WRJ contains a plethora of information about his past psychological issues." *Id.* The last portion of Plaintiff's argument appears to be true. The extensive medical and psychological history apparent on the face of Siders' chart would suggest serious mental health problems to anyone reading it, and so Petitte's alleged refusal to see Siders deserves more scrutiny.

While establishing that conduct is extreme or outrageous is no easy task, a factfinder "may consider whether the extreme and outrageous character of the conduct arose from an abuse by the defendant of a position or relationship to the plaintiff, which gave the defendant actual or apparent authority over the plaintiff or power to affect the plaintiff's interests." *Porter v. W. Va. Reg'l Jail & Corr. Facility Auth.*, No. 3:14-26583, 2015 WL 5698514, at *3 (S.D.W. Va. Sept. 25, 2015) (quoting *Travis*, 504 S.E.2d at 426) (internal citation omitted). Petitte certainly had the authority to affect Siders' interests, and her decision not to interview him or recommend any other supervisory protocols may constitute an abuse of that authority. At the motion to dismiss stage, there is simply insufficient evidence for the Court to rule as a matter of law that a reasonable factfinder could not conclude that Petitte's conduct meets each element of an IIED claim. *See Travis*, 504 S.E.2d at 425. As such, the Court must grant PrimeCare's motion to dismiss Count Nine, but deny PSIMed and Petitte's motion to do the same.

**2. Gaberielse and Pine**

Gaberielse and Pine similarly move for dismissal of Plaintiff's IIED claim, contending that their actions actually represented reasonable attempts to monitor Siders. *Mem. in Support of*

*Gaberielse/Pine Mot. to Dismiss*, at 20. As a preliminary matter, the Court notes that "state officials are not immune from conduct meeting the elements of IIED." *Knouse v. PrimeCare Medical of W. Va.*, No. 2:18-cv-01014, 2019 WL 252448, at *5 (S.D.W. Va. Jan. 17, 2019) (analogizing IIED claims to false light invasion of privacy and battery). The sole question for this Court is therefore whether Gaberielse and Pine's conduct is sufficiently outrageous to state a claim for relief under a theory of IIED.

In support of their motion, the defendants point specifically to Pine's exhortation that drinking too much water would make Siders sick, and Gaberielse's use of the intercom to monitor him. *Mem. in Support of Gaberielse/Pine Mot. to Dismiss*, at 20. Yet they ignore the thrust of Plaintiff's allegations against them: for Gaberielse, that he turned off the intercom in order to ignore Siders and the other inmates, and for Pine, that he was aware of Siders' ongoing hallucinations and overconsumption of water and reacted by laughing the matter off. *Third. Am. Compl.*, at ¶¶ 34–42. Gaberielse and Pine also argue that Plaintiff has failed to allege any emotional distress that resulted from their conduct. *Gaberielse/Pine Reply to Resp. in Opp'n*, at 17. This argument is confounding. Plaintiff has alleged, in detail, that Siders was hallucinating, drinking excessive amounts of water to wash demons from his body, and claiming he was suicidal. The guards' inaction is precisely what Plaintiff alleges caused Siders' distress to continue and worsen.

As noted above, whether an actor abuses a position of actual or apparent authority may give rise to a finding that conduct is extreme or outrageous. *Knouse*, 2019 WL 252448, at *5. The Court has little trouble in finding that Gaberielse and Pine exercised such authority over Siders, and abused it when they failed to respond to the substantial risk of harm that Siders clearly posed to himself. As alleged, this amounts to much more than "mere insults, indignities, threats, annoyance, petty oppressions, or other trivialities." *Gaiters v. Lynn*, 831 F.2d 51, 53 (4th Cir.

1987). Instead, it represents sufficiently outrageous conduct to give rise to a claim for IIED. Gaberielse and Pine's motion must therefore be denied with respect to Count Nine.

### IV. CONCLUSION

As noted at the outset of this opinion, the Court **GRANTS** PSIMed and Anita Petitte's motion, ECF No. 55, to join PrimeCare's Motion to Dismiss, ECF No. 49, which the Court in turn **GRANTS IN PART** with respect to PrimeCare but **DENIES IN PART** with respect to PSIMed and Anita Petitte. The Court further **GRANTS IN PART** Gaberielse and Pine's Motion to Dismiss, ECF No. 45, with respect to claims raised against them in their official capacities and Count Two, but **DENIES IN PART** the motion with respect to Counts Six and Nine.

The Court **DIRECTS** the Clerk to send a copy of this written opinion and order to counsel of record and any unrepresented parties.

ENTER:　　　January 31, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE